# EXHIBIT A

Case 1:07-cv-06681   Document 11-2   Filed 02/08/2008   Page 1 of 12

*THIS NOTE HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.*

No. 2007A-2  
Holder:  

$637,500.00  
John Fife  

Original Issue Date: May 13, 2007

Address:  

303 East Wacker Drive  
Suite 301  
Chicago, IL 60601  

## SERIES 2007 SECURED ORIGINAL ISSUE DISCOUNT NOTE
## DUE NOVEMBER 13, 2007

THIS Note, in the principal amount of Six Hundred Thirty Seven Thousand Five Hundred and 00/100 Dollars ($637,500.00), evidencing a loan (the "Loan") made on May 13, 2007 (the "Loan Origination Date"), is one of a duly authorized issue of Notes of Alex Hazan, a Nevada resident with an address at 146 Bogey Crossing Street, Henderson, NV 89094 (the "Maker"), collectively or individually designated as the Note, as the case may be (the "Note"), due not later than November 13, 2007 ("Maturity Date"), in an aggregate face amount of up to Six Hundred Thirty Seven Thousand Five Hundred and 00/100 Dollars ($637,500.00).

FOR VALUE RECEIVED, the Maker promises to pay to the Holder or registered assigns the sum of Six Hundred Thirty Seven Thousand Five Hundred and 00/100 Dollars ($637,500.00) if paid on or prior to the six (6) month anniversary (the "Maturity Date") of the Loan Origination Date. Upon the occurrence of an Event of Default, the amount of principal due hereunder shall conclusively be Six Hundred Thirty Seven Thousand Five Hundred and 00/100 Dollars ($637,500.00) minus any prepayments that have been made prior to the date of the occurrence of the Event of Default pursuant to Section 6 of this Note (the "Default Amount"), and the entire Default Amount shall be immediately due and payable, and any amounts not so paid shall bear interest at the rate of eighteen (18%) percent per annum from the date of such default through and including the date of payment. The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts, at the address of the Holder last appearing on the Note Register.

This Note is subject to the following additional provisions:

Section 1.    **Representations and Warranties of the Maker**. The Maker represents and warrants to the Holder as of the date hereof as follows:

(a) **Authorization of Agreement**. The Maker has the full right, power and authority to enter into and to consummate the transactions contemplated by this Note and otherwise to carry out its obligations hereunder. Each of this Note, the Stock Pledge Agreement of even date herewith and all other documents delivered in connection herewith (the "Loan Documents"), when executed and delivered by the Maker, will constitute a valid and legally binding obligation of the Maker, enforceable against the Maker in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (c) to the extent the indemnification provisions contained herein may be limited by federal or state securities laws.

(b) **No Conflicts; Advice**. Neither the execution and delivery of the Loan Documents to which the Maker is a party or by which he is bound, nor the consummation of the transactions contemplated thereby, does or will violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which the Maker is subject, or conflict with, violate or constitute a default under any agreement, credit facility, debt or other instrument or understanding to which the Maker is a party. The Maker has consulted such legal, tax and investment advisors as he, in his sole discretion, has deemed necessary or appropriate in connection with his entering into the Note and the other Loan Documents and consummating the transactions contemplated hereby and thereby.

(c) **No Litigation**. There is no action, suit, proceeding, judgment, claim or investigation pending, or to the knowledge of the Maker, threatened against the Maker which could reasonably be expected in any manner to challenge or seek to prevent, enjoin, alter or materially delay any of the transactions contemplated by this Note or the other documents delivered in connection herewith.

(d) **Consents**. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body or other person is required for the valid authorization, execution, delivery and performance by the Maker of the Note and the other documents delivered in connection herewith and the consummation of the transactions contemplated hereby and thereby.

(e) **Bankruptcy**. The Maker is not under the jurisdiction of a court in a Title 11 or similar case (within the meaning of Bankruptcy Code Section 368(a)(3)(A) (or related provisions)) or involved in any insolvency proceeding or reorganization.

(f) **Purpose of Loan, Plan of Repayment**. The Maker intends to use proceeds as described in Schedule A attached hereto. The Maker has a reasonable, good-faith belief in his ability to repay the Loan evidenced by this Note as and when the same may become due and payable. The basis for such belief is set forth in Schedule A attached hereto.

**Section 2.** **Exchangeability and Transferability**. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same, but shall not be issuable in denominations of less than integral multiples of Twenty Thousand Dollars ($20,000) unless such amount represents the full principal balance of Notes outstanding to such Holder. No service charge will be made for such registration

of transfer or exchange. The Holder, by acceptance hereof, agrees to give written notice to the Maker before transferring this Note; such notice will describe briefly the proposed transfer and will give the Maker the name, address, and tax identification number of the proposed transferee, and will further provide the Maker with an opinion of the Holder's counsel that such transfer can be accomplished in accordance with federal and applicable state securities laws (unless such transaction is permitted by the plan of distribution in an effective Registration Statement). Promptly upon receiving such written notice, the Maker shall effect the transfer as directed by the Holder.

**Section 3.** **Covenants.** The Maker covenants and agrees that, so long as any amount is due and owing under the Note, he shall not:

(a) Fail to make any payment of the principal of, interest on, or other obligations in respect of, this Note, free of any claim of subordination, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise), for five (5) business days after the same shall be due and payable;

(b) Fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit, any breach of, this Note or any other of the Loan Documents;

(c) Commence, or suffer to have the issuer of the shares pledged as collateral pursuant to the Stock Pledge Agreement (the "Issuer") commence, a voluntary case under the United States Bankruptcy Code or insolvency laws as now or hereafter in effect or any successor thereto (the "Bankruptcy Code"); or suffer to have an involuntary case commenced against him or the Issuer under the Bankruptcy Code in which the petition is not controverted within thirty (30 days), or is not dismissed within sixty (60) days, after commencement of such involuntary case; or suffer to have a "custodian" (as defined in the Bankruptcy Code) appointed for, or take charge of, all or any substantial part of his property or the property of the Issuer, or commence any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Maker or the Issuer, or suffer to have commenced against him or the Issuer any such proceeding which remains undismissed for a period of sixty (60) days; or be, or suffer to have the Issuer be, adjudicated insolvent or bankrupt; or have or suffer to have any order of relief or other order approving any such case or proceeding entered; or have or suffer to have any appointment of any custodian or the like for any thereof or any substantial part of his property or the property of the Issuer which continues undischarged or unstayed for a period of sixty (60) days; or make, or suffer to have the Issuer make, a general assignment for the benefit of creditors; or fail to pay, or state that he is unable to pay, or suffer to have the Issuer fail to pay, or state that it is unable to pay, its debts generally as they become due; call, or suffer to have the Issuer call, a meeting of all of his or its respective creditors with a view to arranging a composition or adjustment of its debts; or by any act or failure to act indicate, or suffer to have the Issuer indicate, his or its consent to, approval of or acquiescence in any of the foregoing; or take any corporate or other action for the purpose of effecting any of the foregoing;

(d) Default, or suffer to have the Issuer default, in any of his or its obligations under any mortgage, credit agreement or other facility, indenture, agreement or other instrument under which there may be issued, or by which there may be secured or evidenced any indebtedness thereof in an amount exceeding fifty thousand dollars ($50,000.00), whether such indebtedness now exists or shall hereafter be created and such default shall result in such indebtedness becoming or being declared

- 3 -

due and payable prior to the date on which he or it would otherwise become due and payable;

(e) Be, or suffer to have the Issuer be, a party to any Change of Control Transaction (as defined below), or sell or dispose of, or suffer to have the Issuer sell or dispose of, in excess of forty-nine (49%) percent of his or its assets (based on book value calculation as reflected in his or its most recent financial statements) in one or more transactions (whether or not such sale would constitute a Change of Control Transaction);

(f) Suffer to have the Common Stock of the Issuer suspended or delisted from trading for in excess of three (3) Trading Days;

(g) Suffer to have the average daily trading volume of the Common Stock, during any consecutive ten (10) trading-day period, be less than one hundred fifty thousand ($150,000.00) dollars in value; provided, that for purposes of measuring compliance with this covenant, the value of the Common Stock traded for each trading day shall be deemed to be equal to the average of the Volume-Weighted Average Price (the "VWAP") of Common Stock times the volume, each as reported by Bloomberg, L.P.;

(h) Suffer a determination by the U.S. Securities and Exchange Commission or National Association of Securities Dealers, or any applicable state regulatory authority, that he or the Issuer has violated applicable Securities Laws;

(i) [intentionally left blank;

(j) Enter, or suffer to have the Issuer enter, into a transaction or series of transactions that would violate the "Twenty Percent Rule" if the Common Stock were traded on the NASD National Market;

(k) Suffer to have the value of the shares of Common Stock that are pledged to secure the obligations due under the Notes pursuant to the Stock Pledge Agreement (the "Collateral Shares") be equal to less than three (3) times the Maturity Amount on any trading day during the term of this Note; provided, that for purposes of measuring compliance with this covenant, the value of the Collateral Shares (including any additional Collateral Shares that may become Collateral Shares in accordance with the terms of the Stock Pledge Agreement) shall be deemed to be the average of the VWAP of the Common Stock, as reported by Bloomberg, L.P., for the previous five (5) trading days;

(l) Suffer to have a final judgment in respect of any action, suit or proceeding commenced against him or the Issuer awarding damages in an amount exceeding fifty thousand dollars ($50,000.00); or

(m) Make any representation or warranty that is not true and correct in all material respects as of the date of this Note, except for representations and warranties that are expressly made as of a particular date, which shall be true and correct in all material respects as of such date.

Section 4. **Events of Default.** "Event of Default" wherever used herein, means the breach of any covenant hereof (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any

order, rule or regulation of any administrative or governmental body). Upon the occurrence of an Event of Default, which Event of Default is not cured within five (5) Trading Days after its occurrence, the Default Amount calculated as set forth in the second paragraph of this Note shall be immediately due and payable to the Holder, and thereupon default interest shall begin to accrue at the annual rate of eighteen (18%) percent per annum and the Holder shall be entitled to all remedies under law and as set forth in the Stock Pledge Agreement.

Section 5.    **Interest Rate Limitation.** The parties intend to conform strictly to the applicable usury laws in effect from time to time during the term of the Loan. Accordingly, if any transaction contemplated hereby would be usurious under such laws, then notwithstanding any other provision hereof: (i) the aggregate of all interest that is contracted for, charged, or received under this Note or under any other of the Loan Documents shall not exceed the maximum amount of interest allowed by applicable law (the "Highest Lawful Rate"), and any excess shall be promptly credited to the Maker by the Holder (or, to the extent that such consideration shall have been paid, such excess shall be promptly refunded to the Maker by the Holder); (ii) neither the Maker nor any other person now or hereafter liable hereunder shall be obligated to pay the amount of such interest to the extent that it is in excess of the Highest Lawful Rate; and (iii) the effective rate of interest shall be reduced to the Highest Lawful Rate. All sums paid, or agreed to be paid, to the Holder for the use, forbearance, and detention of the debt of the Maker to the Holder shall, to the extent permitted by applicable law, be allocated throughout the full term of the Note until payment is made in full so that the actual rate of interest does not exceed the Highest Lawful Rate in effect at any particular time during the full term thereof. If the total amount of interest paid or accrued pursuant to this Note under the foregoing provisions is less than the total amount of interest that would have accrued if a varying rate per annum equal to the interest rate under the Note had been in effect, then the Maker agrees to pay to the Holder an amount equal to the difference between (x) the lesser of (A) the amount of interest that would have accrued if the Highest Lawful Rate had at all times been in effect, or (B) the amount of interest that would have accrued if a varying rate per annum equal to the interest rate under this Note had at all times been in effect, and (y) the amount of interest accrued in accordance with the other provisions of this Note.

Section 6.    **Prepayment.** The Maker shall have the right to prepay this Note in whole or in part prior to the Maturity Date. The Maker shall give at least five (5) Business Days, but not more than ten (10) Business Days, written notice of any intention to prepay this Note prior to the Maturity Date or any extension thereof to the Holder, which notice shall specify the "Prepayment Date".

Section 7.    **Definitions.** For the purposes hereof, the following terms shall have the following meanings:

"Business Day" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"Change of Control Transaction" means the occurrence of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of in excess of forty-nine percent (49%) of the voting securities of a person, coupled with a replacement of more than one-half of the members of such person's board of directors which is not approved by those individuals who are

-5-

members of the board of directors on the date hereof in one or a series of related transactions, or (ii) the merger of such person with or into another entity, consolidation or sale of all or substantially all of the assets of such person in one or a series of related transactions, unless following such transaction, the holders of such person's securities continue to hold at least forty (40%) of such securities following such transaction. The execution by such person of an agreement to which such person is a party or by which he or it is bound providing for any of the events set forth above in (i) or (ii) does not constitute the occurrence of the event until after the event in fact occurs.

"Common Stock" means the Common Stock of the Issuer.

Section 8.   Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Maker, which is absolute and unconditional, to pay the principal of, interest and liquidated damages (if any) on, this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct obligation of the Maker.

Section 9.   If this Note shall be mutilated, lost, stolen or destroyed, the Maker shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, and indemnity, if requested, all reasonably satisfactory to the Maker.

Section 10.   **Choice of Law and Venue; Submission to Jurisdiction; Service of Process**.

(a)   THE VALIDITY OF THIS NOTE, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS (WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS NOTE SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS OR, AT THE SOLE OPTION OF HOLDER, IN ANY OTHER COURT IN WHICH HOLDER SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY.

(b)   THE MAKER HEREBY SUBMITS FOR HIMSELF AND IN RESPECT OF HIS PROPERTY, GENERALLY AND UNCONDITIONALLY, TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT HE MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

(c)   THE MAKER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT, OR OTHER PROCESS ISSUED IN ANY ACTION OR PROCEEDING AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT, OR OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO MAKER.

(d) NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF THE HOLDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY HOLDER OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

(e) To the extent determined by such court, the Maker shall reimburse the Holder for any reasonable legal fees and disbursements incurred by the Holder in enforcement of or protection of any of his rights under any of this Note.

Section 11. Any waiver by the Maker or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Maker or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note. Any waiver must be in writing.

Section 12. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.

Section 13. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day (or, if such next succeeding Business Day falls in the next calendar month, the preceding Business Day in the appropriate calendar month).

Section 14. Security. The obligation of the Maker for payment of principal, interest and all other sums hereunder, in the event of a default and failure of the Maker to perform hereunder, is secured by the pledge of certain securities (the "Pledged Shares") by the Maker as Pledgor under the terms and conditions of a Stock Pledge Agreement.

Section 15. Waiver of Jury Trial.

THE MAKER HEREBY WAIVES HIS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE. THE MAKER REPRESENTS THAT HE HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES HIS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 16. Fees and Expenses. Each party shall be responsible for paying his own expenses incurred in connection with this transaction, except that the Maker shall pay to the Holder simultaneously with the execution and delivery of this Note a legal, documentation and professional fee in the amount of Two Thousand Five Hundred Dollars ($2,500.00).

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

     **IN WITNESS WHEREOF**, the Maker has caused this instrument to be duly executed by an officer duly authorized for such purpose, as of the date first above indicated.

By: _/s/ Alex Hazan_
Name: ALEX HAZAN

Attest:

By:_____

## Schedule A

### Use of Proceeds

To invest in Royal Springs Water to purchase equipment to expand production lines

## John Fife

**From:** "John Fife" <jfife@chicagoventure.com>
**To:** <alex@royalspringswater.com>
**Cc:** "Tony Gentile" <toneg@bellsouth.net>; "Merrill Weber" <merrilleweber@yahoo.com>
**Sent:** Wednesday, May 23, 2007 6:46 PM
**Subject:** Use of funds

Alex -

I received your message. Sorry we didn't speak. I will talk to you tomorrow.

Please confirm the follow text as the use of funds.

"To invest in Royal Springs Water to purchase equipment to expand production lines"

If this works please let me know and I will attach it as an exhibit to our agreement.

John

**John Fife**

| | |
|---|---|
| From: | <alex@royalspringswater.com> |
| To: | "John Fife" <jfife@chicagoventure.com> |
| Sent: | Thursday, May 24, 2007 10:40 AM |
| Subject: | Re: Use of funds |

Hey john,
It looks good to me.
Thanks,
Alex
Sent from my BlackBerry wireless handheld.

-----Original Message-----
From: "John Fife" <jfife@chicagoventure.com>
Date: Wed, 23 May 2007 18:46:49
To:<alex@royalspringswater.com>
Cc:"Tony Gentile" <toneg@bellsouth.net>,"Merrill Weber" <merrilleweber@yahoo.com>
Subject: Use of funds

Alex -

I received your message. Sorry we didn't speak. I will talk to you tomorrow.

Please confirm the follow text as the use of funds.

"To invest in Royal Springs Water to purchase equipment to expand production lines"

If this works please let me know and I will attach it as an exhibit to our agreement.

John

5/31/2007