IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN FIFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No: 07 C 6681 |
| | ) | |
| ALEX HAZAN, | ) | Honorable Charles P. Korocas |
| | ) | Magistrate Judge Denlow |
| Defendant. | ) | |

**AFFIDAVIT OF JOHN FIFE**

John Fife, being first duly sworn on oath, deposes and states as follows:

1. This affidavit is based upon my personal knowledge and if called to testify I would competently testify set forth herein.

1. On or about May 13, 2007, I loaned $500,000.00 ("Loan Amount") under a promissory note to Hazan, personally, so he could purchase equipment for his company, Royal Spring Water, Inc. ("Royal Spring"). As consideration for the loan, Hazan agreed to repay me $637,500.00 when the loan became due.

2. Hazan also pledged to me common stock in Royal Spring as collateral for the loan, which I could sell in the event that he defaulted under the loan.

3. My agreement with Hazan is set forth in two written documents. The first agreement, titled the "Series 2007 Secured Original Issue Discount Note Due November 13, 2007" ("Promissory Note"), memorializes the promissory note between myself and Hazan in which Hazan received the Loan Amount in exchange for Hazan's promise to repay me $637,500.00 ("Maturity Amount") no later than November 13, 2007, or upon

failure to cure an event of default, whichever occurred first. ("Maturity Date"). A true and correct copy of the Promissory Note is attached as Exhibit A to the Brief Relating to Damages, Costs, and Fees for Entry of Final Judgment against Defendant ("Brief Relating to Damages, Costs, and Fees").

4. The second agreement, titled the "Stock Pledge Agreement" ("Stock Agreement"), contains the terms of Hazan's pledge to me of 1,000,000 shares of common stock in Royal Spring as collateral for the loan made under the Promissory Note (the 1,000,000 shares of common stock pledged to Fife as collateral are hereinafter referred to as the "Royal Spring Stock"). A true and correct copy of the Stock Agreement is attached as Exhibit B to the Brief Relating to Damages, Costs, and Fees.

### *The Promissory Note*

5. Under section 3 of the Promissory Note, Hazan covenanted to me, among other things, that he would (1) make all payments of principal, interest, and other obligations under the note; (2) ensure that the common stock of Royal Spring had an average daily trading volume of at least $150,000.00 for any ten trading-day period; and, (3) warrant that the market value of Royal Spring Stock would not be less than three times the Maturity Amount during the term of the note. (Brief Relating to Damages, Costs, and Fees, Ex. A, Promissory Note, §§ 3(a), (g), and (k).)

6. Hazan promised under section 3(g) of the Promissory Note that the average daily trading volume of Royal Spring's common stock would not,

> during any consecutive ten (10) trading-day period, be less than one hundred fifty thousand ($150,000.00) dollars in value; provided that, for the purposes of measuring compliance with this covenant, the value of the Common Stock traded for each trading day shall be deemed to be equal to the average of the Volume

    Weighted Average Price [ ] of the Common Stock times the volume, each as reported by Bloomberg, L.P.

(*Id.*, § 3(g).) Both of us understood that the Volume Weighted Average Price ("VWAP"), as used in the agreements, referred to a publicly-listed figure calculated by commercial financial institutions, including Bloomberg, L.P.

  7. As a separate covenant, section 3(k) of the Promissory Note provided that the market value of the Royal Spring Stock tendered as collateral would not be less than three (3) times the Maturity Amount during the term of the Promissory Note. If the value of the Royal Spring Stock decreased below this threshold, Hazan agreed to provide me with sufficient additional collateral so that the value of the collateral held by me was equal or greater to three times the Maturity Amount.

  8. Hazan agreed that the failure to adhere to any of the covenants of the Promissory Note would constitute an event of default. The Promissory Note gave Hazan five (5) trading days after the event of default to cure the event. (*Id.*, § 4.)

  9. If Hazan failed to cure his default within five trading days, section 4 of the Promissory Note required that the remaining, unpaid Maturity Amount ("Outstanding Maturing Amount") would become immediately due and payable to me, and that default interest would begin to accrue immediately on the Outstanding Maturity Amount at the rate of eighteen percent (18%) per annum.

  10. Upon the occurrence of an event of default, section 4 of the Promissory Note, among other provisions, also authorized me to sell the Royal Spring Stock or otherwise exercise any rights provided under the Stock Agreement with respect to the Royal Spring Stock.

### *The Stock Agreement*

11.　On the happening of an event of default under the Promissory Note, the Stock Agreement authorized me to sell all or part of the Royal Spring Stock held as collateral, through a private or public sale, "at any exchange, broker's board or at any of [Fife's] offices or elsewhere, for cash, on credit, or for future delivery, at such time or times and at such price or prices and upon such other terms as [Fife] may deem commercially reasonable." (Brief Relating to Damages, Costs, and Fees, Ex. A, Stock Agreement § 11(a).)

12.　Pursuant to the Promissory Note and the Stock Agreement, the amount received from the sale of the Royal Spring Stock would then be applied to the Outstanding Maturity Amount. I, however, could recover from Hazan the remainder of the Outstanding Maturity Amount still due and payable. (*See id.*, § 12(b).)

13.　Hazan agreed under both the Promissory Note and the Stock Agreement to reimburse me for all legal fees and disbursements incurred by me in enforcing the terms of the Promissory Note. (Brief Relating to Damages, Costs, and Fees, Ex. A, Promissory Note, § 10(e); *Id.* at Ex. B, Stock Agreement, § 13(b).)

### *Hazan's Default under the Promissory Note*

14.　Beginning on May 30, 2007, the average daily trading volume of the common stock of Royal Spring fell below $150,000.00, and remained below $150,000.00 for at least 10-consecutive days. (Complaint (Docket No. 1), Ex. D, First Default Letter.)

15.　Under section 3(g) of the Promissory Note, the shortfall in the average daily trading volume of the common stock of Royal Spring constituted an event of

default, which Hazan failed to cure within five trading days. (Brief Relating to Damages, Costs, and Fees, Ex. A, Promissory Note, §§ 3(g), 4.)

16. On or about June 20, 2007, the Outstanding Maturity Amount became immediate due and default interest of eighteen percent per annum began accruing on the Outstanding Maturity Amount. (*Id.* § 4.)

17. On July 10, 2007, the Royal Spring Stock's market value fell below the required benchmark of being three (3) times the value of the Maturity Amount, as required by section 3(k) of the Promissory Note.

18. Specifically, the average VWAP of common stock for Royal Spring for the five previous trading days to July, 10, 2007 was $1.72, and the value of the Royal Spring Stock was only $1,720,000. (Complaint, Ex. E, Second Default Letter). The required value of three times the Maturity Amount was $1,912,500, leaving a shortfall of $192,500.00.

19. The shortfall in the Royal Spring Stock's value constituted a second event of default under section 3(k) of the Promissory Note. (Brief Relating to Damages, Costs, and Fees, Ex. A, Promissory Note, § 3(k).) Under the terms of the Stock Agreement, Hazan was required pledge to me additional common stock of Royal Spring to alleviate the shortfall. Hazan refused to pledge to me additional shares and continues to refuse to pledge more shares.

20. Upon Hazan's second default under the Promissory Note, I commenced the sale of the Royal Spring Stock to satisfy the Outstanding Maturity Amount of $637,500.00. All sales of the Royal Spring Stock were made at market prices.

21. Between July 2007 and October 2007, I sold the Royal Spring Stock for a total of $537,195.62. The proceeds received from the sales of the Royal Spring Stock were $100,304.38 short of the Outstanding Maturity Amount, exclusive of the default interest, costs, and fees.

22. Under the Promissory Note, default interest of eighteen percent per annum began accruing on any outstanding maturity amount on or about June 20, 2007 and continues to accrue through today. By calculations that I was provided and subsequently verified, the default interest accrued is $31,246.04 as of March 12, 2008, and will be $31,700.41 as of March 19, 2008.

23. In addition to those fees and costs incurred and billed by my attorneys Wildman, Harrold Allen & Dixon, LLP, I have also incurred attorneys fees and other disbursements in the amount of $850.00 from the Logan Law Firm for the drafting of the default notices due to Hazan's default under the Promissory Note. These attorneys' fees and disbursements were incurred during the enforcement of the Note and have been paid.

24. In total, Hazan will owe to me $132,854.79 as of March 19, 2008, inclusive of interest and certain attorneys fees and costs, but exclusive of attorneys' fees and other costs incurred and/or billed by Wildman, Harrold, Allen & Dixon, LLP.

25. All of the figures and amounts stated above are true and correct to the best of my knowledge.

FURTHER AFFIANT SAYETH NOT.

_____
John Fife

Subscribed and sworn to before me this 12 th day of March, 2008.

_____
NOTARY PUBLIC

OFFICIAL SEAL
ROBERT T SULLIVAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/26/10